## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 10 2018, 10:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of K.C., J.C., and K.H. (Minor Children), and<br><br>S.C. (Mother),<br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br>*Appellee-Petitioner* | October 10, 2018<br><br>Court of Appeals Case No. 18A-JT-781<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Gary K. Chavers, Judge<br><br>The Honorable Larry E. Bradley, Magistrate<br><br>Trial Court Cause Nos. 49D09-1709-JT-884, -885, -886 |

**Crone, Judge.**

## Case Summary

[1] S.C. ("Mother") appeals the trial court's order involuntarily terminating her parental rights to her minor children, K.C., J.C., and K.H. (collectively "the Children").[1] She argues that the evidence is insufficient to support the trial court's termination of her parental rights. Finding the evidence sufficient, we affirm.

## Facts and Procedural History

[2] K.C. was born in April 2012 and J.C. was born in December 2013. Mother and J.C.'s father had an extensive history of domestic violence. On June 9, 2014, the Indiana Department of Child Services ("DCS") filed a petition alleging that K.C. and J.C. were children in need of services ("CHINS") based on allegations of a recent physical altercation between Mother and J.C.'s father in the presence of K.C. and J.C. Following a detention hearing held that same day, the trial court removed K.C. and J.C. from Mother's care. In August 2014, the trial court held a factfinding hearing and adjudicated K.C. and J.C. as CHINS based on Mother's written admission regarding the physical altercation with J.C.'s father and an admission that she lacked stable housing. The trial court subsequently entered dispositional and parental participation orders that required Mother to participate in services. While the goal remained

---

[1] Each of the minor children has a different biological father. K.C.'s and J.C.'s respective fathers previously had their parental rights involuntarily terminated. The trial court terminated the parental rights of K.H.'s father as part of its order here, but K.H.'s father does not participate in this appeal.

reunification for a substantial period of time, in October 2016, the trial court held a permanency hearing and changed the plan from reunification to adoption for K.C. and J.C. after numerous reports of Mother's inconsistent participation with services. Specifically, the court stated:[2]

> 1. This case has been open for two years and Mother has made no progress.
>
> 2. Mother has been inconsistent with her services and when she does participate is not engaged or motivated to meet her goals.
>
> 3. Mother has been inconsistent with parenting time and the last three visits have been canceled ….
>
> 4. Mother stopped [drug screens] at the end of August.
>
> 5. K.C. and J.C. are doing well in their placement and need permanency.
>
> 6. The GAL [guardian ad litem] is in agreement with the plan changing to adoption.

Ex. at 19.

[3]     K.H. was born in July 2015. In March 2016, DCS filed a CHINS petition alleging that Mother had failed to provide a safe, stable living environment, and

---

[2] The trial court's orders refer to the parties by their full names. We use "Mother" and the minor children's initials where appropriate.

lacked the financial means to provide K.H. with basic care, and that her home lacked working utilities. K.H. was removed from Mother's care and placed in the same foster home with K.C. and J.C. In November 2016, the trial court held a factfinding hearing and adjudicated K.H. a CHINS. In September 2017, the trial court changed the permanency plan from reunification to adoption for K.H. after finding that Mother still did not have housing, her participation in services was "inconsistent," and there had been "no real progress towards reunification." Ex. at 9. The GAL was in agreement with the plan changing to adoption.

[4]    On October 4, 2017, DCS filed petitions to involuntarily terminate Mother's parental rights to all three Children. After a consolidated hearing, the trial court issued the following relevant findings:

> 11. The Children had been removed from their respective parents for at least six (6) months under a dispositional decree prior to this termination action ….
>
> 12. Services were ordered and referred for Mother under the first CHINS case at the August 21, 2014 disposition hearing. Services included home based counseling and case management, and to undergo a domestic violence assessment and follow recommendations. Parenting education was also ordered with it to be done by a home based provider, if possible.
>
> 13. Mother completed domestic violence classes.
>
> 14. Home based case management to address housing and employment had been referred in January of 2016, but was

closed out in mid-2016, due to the case manager not receiving documentation of housing and income to assess needs. Documentation was requested from Mother.

….

17. Mother reported employment but there were concerns she was not being honest. During the three and one-half years since the first CHINS case was filed, Mother supplied one McDonald's pay stub although documentation was requested several times. Mother testified having seven different places of employment while the CHINS cases have been pending.

18. Mother struggles financially with one child in her home at this time.

19. Mother has resided at five locations since the first CHINS case was filed. There is no evidence that Mother provided proof of a valid lease during the last three and one-half years.

….

22. Therapy has been mostly ongoing since 2015.

23. Mother's current therapist is Shawn Arroyo who has been the ongoing therapist since August of 2017. Therapist Arroyo first worked with Mother in March of 2016, but later unsuccessfully discharged her due to her noncompliance.

24. There was another therapy referral during the lapse of time between Therapist Arroyo's noninvolvement in the CHINS cases.

25. During the 2016 referral, therapy goals were to address the trauma Mother experienced in childhood and what effect i[t] has on her life now, providing a safe living environment, and child rearing.

26. Limited progress was made on the therapy goals before Mother's unsuccessful discharge.

27. The goals for the 2017 referral with Therapist Arroyo involved working on issues that had currently affected Mother in her functioning, including decreasing anxiety and processing her involvement with [DCS] prior to addressing long term goals such as her trauma.

28. Mother made much more progress than in the 2016 referral. However, at the time of trial, the therapist did not feel Mother would be able to care for her children and he questioned Mother's judgment.

29. When asked if she though[t] therapy helped, Mother replied, "umm, I guess."

30. With the exception of K.H.'s visits being suspended for a few months, parenting time has been in effect throughout the CHINS cases. The same facilitator, Kristina Hursey, has been working with Mother since January of 2016.

31. In early 2016, Mother was again in case management services and was willing to accept being redirected to the point that unsupervised parenting time and overnights were recommended and established. Due to safety concerns of finding [J.C.'s alleged father], who was not to have contact, on Mother's porch, parenting time went back to supervised.

32. Ms. Hursey could not recommend unsupervised parenting time after June of 2016, due to Mother struggling with consistently making sessions or coming late, not having, or not having proper, food and supplies, due to safety and supervision concerns.

33. Ms. Hursey had concerns about Mother's lack of interaction and engagement with the Children in mid to late 2017.

34. Mother has not missed a parenting time session in 2018. However, sessions were lowered to once a month in December of 2017.

35. Until recently, K.C. and J.C.'s parenting time was scheduled separately from K.H. because having all three children at once was too much for Mother to handle.

36. K.C. and J.C. have been in the same placement together for approximately three years. K.H. joined them approximately one and one-half years ago.

37. The current placement is preadoptive.

38. The Children are happy and comfortable in their placement where their needs are being met.

39. K.C. and J.C. have been engaged in therapy since March of 2017, to help process feelings.

40. J.C. has aggression issues which are being addressed through frustration management, identifying the cause of his anger and learning calming methods.

41. …. Services have been referred for almost four years and Mother has not demonstrated she can maintain independent, appropriate housing and employment, or that she has developed the parenting skills necessary to safely care for four children under age six.

Appellant's App. Vol. 2 at 23-25.

[5] Based upon these findings of fact, the trial court concluded that: (1) there is a reasonable probability that the conditions that resulted in the Children's removal and continued placement outside the home will not be remedied by Mother; (2) there is a reasonable probability that the continuation of the relationship between Mother and the Children poses a threat to the Children's well-being; (3) termination of the parent-child relationship between Mother and the Children is in the Children's best interests; and (4) DCS has a satisfactory plan for the care and treatment of the Children, which is adoption by their current foster family. Accordingly, the trial court determined that DCS had proven the allegations of the petition to terminate parental rights by clear and convincing evidence and therefore terminated Mother's parental rights. This appeal ensued.

## Discussion and Decision

[6] "The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental

responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.* A petition for the involuntary termination of parental rights must allege in pertinent part:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove that termination is appropriate by a showing of clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[7] "We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

## Section 1 – Clear and convincing evidence supports the trial court's conclusion that there is a reasonable probability of unchanged conditions.

[8] Mother challenges the sufficiency of the evidence supporting the trial court's conclusion that there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied.[3] In determining whether there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside

---

[3] Mother also challenges the sufficiency of the evidence supporting the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children. However, Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of that subsection has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. Accordingly, we will address the sufficiency of the evidence regarding only one of the three requirements.

the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to their placement and retention in foster care." *Id.* Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* (quoting *In re I.A.*, 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[9] Here, K.C. and J.C. were initially removed from Mother's care due to her lack of stable housing and after a physical altercation between Mother and J.C.'s father occurred in their presence. K.H. was later removed from Mother's care

because Mother did not have stable housing with working utilities, and there were also concerns about substance abuse in the home. Thereafter, Mother was ordered to participate in services. Although she did complete domestic violence classes, the evidence indicates that Mother inconsistently participated and made little to no progress in other ordered home-based services that attempted to address her deficiencies regarding housing, employment, and parenting skills.

[10] Regarding her housing and employment, at the time of the termination hearing, Mother failed to provide credible evidence that she had obtained independent stable housing or sustainable employment. The visitation facilitator testified that Mother had been inconsistent with her supervised visitation with the Children over the course of the proceedings, often missing sessions, coming late, not having proper food or supplies, and failing to provide appropriate supervision. Mother also demonstrated a lack of interaction and engagement with the Children during visitation. Throughout almost the entire pendency of this matter, Mother was unable to visit with all three of the Children at once, because it was simply too much for her to handle. As for her current ability to safely parent the Children, Mother's long-time therapist and two DCS family case managers ("FCMs") all stated that they continued to question Mother's judgment and did not believe that Mother had developed the skills necessary to adequately supervise and care for four children under the age of six.[4]

---

[4] Mother has a one-year-old daughter who was born in September 2017 and resides with Mother. This child was not involved in the present termination case.

In sum, DCS has been involved with this family and has been trying to help Mother learn how to provide for the Children's needs for more than three years; however, the evidence shows that those efforts have been largely unsuccessful. The trial court was under no obligation to wait any longer to see if Mother was willing or able to remedy conditions. There is sufficient evidence in the record to support the trial court's conclusion that there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside of Mother's care will not be remedied by Mother.[5]

## Section 2 – Clear and convincing evidence supports the trial court's conclusion that termination of Mother's parental rights is in the Children's best interests.

Mother next challenges the sufficiency of the evidence to support the trial court's conclusion that termination of her parental rights is in the Children's best interests. In considering whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id*. The trial court need not wait until the child is irreversibly harmed before terminating parental rights. *Id*. "The historic

---

[5] Mother challenges some of the trial court's individual findings of fact or portions of certain findings of fact, but we need not address these challenges because we have resolved the issue presented based on the unchallenged findings and the evidence underlying those findings.

inability to provide adequate housing, stability, and supervision, coupled with the current inability to provide the same, will support a finding that continuation of the parent-child relationship is contrary to the child's best interests." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). The testimony of service providers may support a finding that termination is in the child's best interests. *McBride,* 798 N.E.2d at 203.

[13] Here, FCM Joyce Box testified that Mother never progressed in services to the point where DCS could recommend the Children's placement with her due to her continued inability to appropriately supervise the Children, follow dietary guidelines for two of the Children,[6] obtain stable housing, or maintain employment. Similarly, FCM Loren Manning testified that Mother had not demonstrated the ability to appropriately supervise and provide for the basic needs of the Children. She opined that it was in the Children's best interests for Mother's parental rights to be terminated and for the Children to be adopted into their current foster home.

[14] GAL Rabia Baksh also opined that termination of Mother's parental rights was in the Children's best interests. She noted that K.C. and J.H. have been out of Mother's care for three years, and K.H. has been out of Mother's care for one and a half years. She observed that Mother has been "either unwilling or unable to provide the stability that … these children need" and that she

---

[6] Two of the Children are lactose intolerant.

continues to be unable to "provide a safe, secure home for them." Tr. Vol. 2 at 126, 134. GAL Baksh stated that she did not believe that additional time would result in any positive changes on Mother's part, and that the Children's pre-adoptive home provided the stability and nurturing that the Children need.

[15] The evidence of unchanged conditions coupled with the testimony of service providers supports the trial court's conclusion that termination of Mother's rights is in the Children's best interests. "[C]hildren have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *K.T.K.*, 989 N.E.2d at 1230 (quoting *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011)). These Children need the safety and stability that adoption can provide them. Accordingly, we affirm the trial court's termination of Mother's parental rights.

[16] Affirmed.

Najam, J., and Pyle, J., concur.